# United States Court of Appeals for the Federal Circuit

2007-1169, -1316

COMPUTER DOCKING STATION CORPORATION,

Plaintiff-Appellant,

v.

DELL, INC.,

Defendant-Cross Appellant,

and

GATEWAY, INC.,

Defendant-Cross Appellant,

and

TOSHIBA AMERICA, INC. and TOSHIBA AMERICA INFORMATION SYSTEMS, INC.,

Defendants-Cross Appellants.

Roderick G. Dorman, Hennigan, Bennett & Dorman LLP, of Los Angeles, California, argued for plaintiff-appellant. With him on the brief was Kevin I. Shenkman.

Vito A. Canuso III, Knobbe, Martens, Olson & Bear, LLP, of Irvine, California, argued for all defendants-cross appellants. With him on the brief for defendants-cross appellants Toshiba America, Inc., et al., were Joseph R. Re and Edward M. Cannon. On the brief for defendant-cross appellant Dell, Inc., were Brian K. Buss, David B. Weaver, Richard R. Ruble, and Gentry C. McLean, Vinson & Elkins, LLP, of Austin, Texas. On the brief for defendant-cross appellant Gateway, Inc., were Jonathan D. Baker, W. Bryan Farney, and Mason A. Gross, Dechert LLP, of Mountain View, California.

Appealed from: United States District Court for the Western District of Wisconsin

Chief Judge Barbara B. Crabb

# United States Court of Appeals for the Federal Circuit

2007-1169, -1316

COMPUTER DOCKING STATION CORPORATION,

Plaintiff-Appellant,

v.

DELL, INC.,

Defendant-Cross Appellant,

and

GATEWAY, INC.,

Defendant-Cross Appellant,

and

TOSHIBA AMERICA, INC. and TOSHIBA AMERICA INFORMATION SYSTEMS, INC.,

Defendants-Cross Appellants.

Appeals from the United States District Court for the Western District of Wisconsin in case No. 06-CV-0032, Chief Judge Barbara B. Crabb.

_____

DECIDED: March 21, 2008

_____

Before MICHEL, Chief Judge, PLAGER, Senior Circuit Judge, and RADER, Circuit Judge.

RADER, Circuit Judge.

On summary judgment, the United States District Court for the Western District of Wisconsin determined that Dell, Inc., Gateway, Inc., Toshiba America, Inc., and Toshiba America Information Systems, Inc. (collectively Defendants) did not infringe claims 17-

20, 22, 24, and 26-28 of Computer Docking Station Corporation's (CDSC's) United States Patent No. 5,187,645 ('645 patent). <u>Computer Docking Station Corp. v. Dell, Inc.</u>, Case No. 06-C-0032-C, 2007 U.S. Dist. LEXIS 2419 (W.D. Wis. Jan. 10, 2007) (<u>Summary Judgment Order</u>). Because the patentee disavowed an interpretation of "portable computer" that would encompass a computer with a built-in display or keyboard, this court affirms the district court's holding of no infringement. This court also affirms the district court's finding that the case was not exceptional and that attorney fees were not warranted under 35 U.S.C. § 285.

I

The '645 patent claims a portable microprocessor system with sufficient processing power, memory, and network compatibility for business applications. '645 patent col.3 ll.18-20. Figure 1 below depicts this system with the microprocessor contained in the main housing under the label 10. The specification teaches that the main housing's size and weight account in part for the system's portability. <u>Id.</u> col.1 ll.29-36, 56-62; col.3 ll.44-45. The main housing "resembles a brick" about eleven inches high, eight inches wide, and three inches thick. It weighs approximately eight pounds. As illustrated in Figure 2, the main housing may fit in one half of an attaché case. <u>Id.</u> col.3 ll.33-45.



The system also includes the capability to connect to peripheral devices, such as a keyboard or mouse. The parties agree that the term "peripheral device" means "an external device that is capable of connecting to, and is capable of being controlled by, a computer." Computer Docking Station Corp. v. Dell, Inc., No. 06-C-32-C, 2006 U.S. Dist. LEXIS 58388, at *10-11 (W.D. Wis. Aug. 16, 2006) (Claim Construction Order). The main housing connects to these peripheral devices either through individual connectors (one connector per peripheral device), or through a docking connector, which "allows all peripheral connections to be realized through a single connector." '645 patent col.1 ll.24-31; col.2 ll.23-34. The docking connector simplifies coupling and decoupling of the main housing with peripheral devices. Id. col.1 ll.29-36; col.3 ll.64-66 ("[O]nly one connection is necessary to disconnect the system or connect the system."). Figure 6 illustrates individual connections between the main housing and each peripheral device; Figure 3 illustrates a connection between the main housing and docking connector. Id. col.7 ll.23-26; col.2 ll.42-43.



FIG. 6

FIG. 3

The specification explains that a keyboard and visual display are "options available with the system." Id. col.2 ll.8-11. Figures 13-15 illustrate these options. Figure 13 shows that a keyboard 60 and display 58 "may be coupled with the microcomputer system." Id. col.7 ll.23-24. The keyboard connects to the housing using connector 24b, shown on the left-hand side of the rear bezel in Figure 6. Id. col.5 ll.30-31. As shown in Figure 14, display 58 is also external to the housing, but may be attached to and removed from it using individual connectors and thumbscrews. Id. col.7 ll.28-42. Figure 15 shows the housing as it fits with the display and keyboard.



FIG. 13    FIG. 14    FIG. 15

Each of the asserted claims requires a "portable computer" or "portable computer microprocessing system" (the "portable computer limitation") and a "single connector for making all connections from the microprocessor to said specific computer peripheral devices" (the "all connections limitation"). Claim 28 is representative of the three asserted independent claims:

28.    A <u>portable computer</u> comprising:

a)    a microprocessor for processing instructions;

b)    a housing containing the microprocessor;

c)    a plurality of computer-peripheral-device-specific connectors in electrical communication with the microprocessor such that each of said plurality of computer-peripheral-device specific connectors provides a computer-peripheral-device specific data link to said

> microprocessors, said connectors for connecting the microprocessor to specific computer peripheral devices and being mounted on the housing; and
>
> d) another single connector on the housing, said single connector comprising a set of pins, said set further comprising a plurality of subsets of computer-peripheral-device-specific pins being in electrical communication with said microprocessor such that one of each of said subsets of computer-peripheral-device-specific pins provides the same computer-peripheral-device-specific data link as said each of said plurality of computer-peripheral-device-specific connectors, <u>said single connector for making all connections from the microprocessor to said specific computer peripheral devices</u>.

Id. col.12 ll.11-34 (emphases added).

During prosecution, the examiner rejected several claims as anticipated and obvious in view of U.S. Patent No. 5,030,128 to Herron et al. ('128 patent or Herron). Herron discloses a laptop computer and a docking module that facilitates operation on a desktop. Herron connects each peripheral to the docking module. '128 patent col.2 ll.3-38. Attempting to distinguish Herron, the applicants expressly defined their invention in different terms. In addition, the applicants amended the claims. After an interview, the examiner found that the amended "claims directed to redundant connectors (one set plural & one a single connector) would be allowable." The '645 patent issued in February 1993 and was later assigned to CDSC.

Defendants produce various computer devices, including laptops and docking stations. In its amended complaint, CDSC identified a number of defendants' laptop computers and docking stations as infringing. The record shows that each accused laptop computer has a built-in display or keyboard.

The district court construed "portable computer" and "portable computer microprocessing system" in the preambles of the asserted claims to mean "a computer without a built-in display or keyboard that is capable of being moved or carried about."

<u>Claim Construction Order</u>, 2006 U.S. Dist. LEXIS 58388, at *32-33. The trial court determined that the prosecution history and the specification distinguished the claimed invention from a laptop computer. In particular, the district court found that the applicants had emphasized the differences between their invention and laptop computers to overcome the examiner's rejections based on Herron. Because the district court held that the statements in the prosecution history amounted to a clear and unmistakable disavowal, it construed the terms "portable computer" and "portable computer microprocessing system" to exclude computers with built-in displays or keyboards. <u>Id.</u> at *18-24. The district court also construed the phrase "said single connector for making all connections from the microprocessor to said computer peripheral devices" to require "that all individual peripheral device connections on the housing that connect to the microprocessor also pass through the single connector." <u>Id.</u> at *40-45.

Based on these claim interpretations, CDSC itself sought entry of final judgment of non-infringement, conceding that none of the accused products meets the court's construction of the portable computer limitation. CDSC also noted that some of the accused products do not satisfy the all connections limitation. CDSC admitted that each accused product "includes a computer that has a keyboard and display that are affixed to the housing . . . and are not designed to be detached in ordinary use." Pl.'s Mem. Supp. Entry Final J. Non-Infringe. and Certification, Case No. 06-C-0032-C, Docket No. 105, filed Sept. 15, 2006, at 2. Defendants opposed the motion, because the parties could not agree on the form of judgment for the all connections limitation. The district court denied CDSC's motion. <u>Computer Docking Station Corp. v. Dell, Inc.</u>, Case No.

06-C-0032-C, 2006 U.S. Dist. LEXIS 74421 (W.D. Wis. Oct. 11, 2006). Defendants then moved for summary judgment of non-infringement based on both limitations. Because Defendants introduced new documents in support of their motion as it related to the all connections limitation, CDSC filed a Federal Rule of Civil Procedure 56(f) motion for additional discovery. The district court denied the Rule 56(f) motion and granted Defendants' motion for summary judgment based on both limitations. Summary Judgment Order, 2007 U.S. Dist. LEXIS 2419. The district court denied Defendants' motion for attorney fees and costs under 35 U.S.C. § 285. Computer Docking Station Corp. v. Dell, Inc., Case No. 06-C-0032-C, 2007 U.S. Dist. LEXIS 24045 (W.D. Wis. Mar. 29, 2007) (Fees Order).

CDSC appeals the district court's construction of the portable computer and all connections limitations, its grant of summary judgment on both limitations, and its denial of CDSC's Rule 56(f) motion. Defendants appeal the district court's denial of the motion for attorney fees. This court has jurisdiction under 28 U.S.C. § 1295(a)(1).

II

This court reviews a district court's grant of summary judgment of non-infringement without deference. O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc., 467 F.3d 1355, 1359 (Fed. Cir. 2006). "Our de novo review of summary judgment of noninfringement requires two steps – claim construction, which we review without deference, and infringement, which we review to determine whether there was no genuine issue of material fact." Ormco Corp. v. Align Tech., Inc., 498 F.3d 1307, 1312 (Fed. Cir. 2007).

This court applies the law of the regional circuit to discovery issues. Springs Window Fashions LP v. Novo Indus., L.P., 323 F.3d 989, 997 (Fed. Cir. 2003) (applying Seventh Circuit law). The Seventh Circuit employs an abuse of discretion standard in reviewing a district court's decision to deny a Rule 56(f) motion. Id. This court reviews a denial of attorney fees under 35 U.S.C. § 285 for an abuse of discretion. However, this court reviews an exceptional case determination under § 285 for clear error. Astra Aktiebolag v. Andrx Pharms., Inc., 483 F.3d 1364, 1375 (Fed. Cir. 2007).

The words of the claims define the scope of the patented invention. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). "It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." Id. Claim terms are generally given their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) (citations omitted). However, the person of ordinary skill is deemed to read the claim terms in the context of the entire patent, including the specification and prosecution history. Id.

Occasionally specification explanations may lead one of ordinary skill to interpret a claim term more narrowly than its plain meaning suggests. Nonetheless, this court will not countenance the importation of claim limitations from a few specification statements or figures into the claims, see id. at 1323 (warning against importing limitations from specification and noting that "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against

confining the claims to those embodiments"), particularly if those specification extracts describe only embodiments of a broader claimed invention, see, e.g., Verizon Servs. Corp. v. Vonage Holdings Corp., 503 F.3d 1295, 1302-03 (Fed. Cir. 2007) (examples of translation in specification involving change in protocol from higher to lower level did not support importing a high-to-low limitation into claims); Liquid Dynamics Corp. v. Vaughan Co., 355 F.3d 1361, 1366, 1369 (Fed. Cir. 2004) (subset of figures from specification depicting perfectly helical flow of slurry in a slurry tank did not limit claim, which required "substantial[ly] helical" flow, to perfectly helical flow).  By the same token, "the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" Phillips, 415 F.3d at 1315 (quoting Vitronics, 90 F.3d at 1582).  The specification may show that "the patentee has disclaimed subject matter or has otherwise limited the scope of the claims." Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1343 (Fed. Cir. 2001).  For example, repeated and definitive remarks in the written description could restrict a claim limitation to a particular structure. See Watts v. XL Sys., 232 F.3d 877, 882 (Fed. Cir. 2000).

Statements made during prosecution may also affect the scope of the claims. Rexnord, 274 F.3d at 1343.  Specifically, "a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution." Purdue Pharma L.P. v. Endo Pharms., Inc., 438 F.3d 1123, 1136 (Fed. Cir. 2006).  A patentee could do so, for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art. See, e.g., Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1349 (Fed. Cir. 2004) (limiting the term "transmitting" to require

direct transmission over telephone line because the patentee stated during prosecution that the invention transmits over a standard telephone line, thus disclaiming transmission over a packet-switched network); Alloc v. Int'l Trade Comm'n, 342 F.3d 1361, 1372 (Fed. Cir. 2003) (finding the patentee expressly disavowed floor paneling systems without "play" because the applicant cited the feature during prosecution to overcome prior art); Bell Atl. Network Servs. v. Covad Commc'ns Group, Inc., 262 F.3d 1258, 1273 (Fed. Cir. 2001) (limiting operation of the "transceiver" to the three stated modes because of clearly limiting statements made by the patentee to try to overcome a prior art rejection). The doctrine of prosecution disclaimer "protects the public's reliance on definitive statements made during prosecution" by "precluding patentees from recapturing through claim interpretation specific meanings [clearly and unmistakably] disclaimed during prosecution." Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1323-24 (Fed. Cir. 2003) (citing in part Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 220-21 (1940)) (bracketed material added). Claims should not be construed "one way in order to obtain their allowance and in a different way against accused infringers." Chimie v. PPG Indus., 402 F.3d 1371, 1384 (Fed. Cir. 2005) (citation omitted).

Prosecution disclaimer does not apply to an ambiguous disavowal. See N. Telecom Ltd. v. Samsung Elec. Co., 215 F.3d 1281, 1293-95 (Fed. Cir. 2000) (holding that prosecution disclaimer did not "support the judicial narrowing of a clear claim term" because the inventors' statements were amenable to multiple reasonable interpretations); Pall Corp. v. PTI Techs. Inc., 259 F.3d 1383, 1393-94 (Fed. Cir. 2001) (remanding because the scope of disclaimer over the prior art reference was

ambiguous), vacated on other grounds, 535 U.S. 1109 (2002). Prosecution disclaimer does not apply, for example, if the applicant simply describes features of the prior art and does not distinguish the claimed invention based on those features. See Eolas Techs., Inc. v. Microsoft Corp., 399 F.3d 1325, 1337 (Fed. Cir. 2005). And if the specification expressly defines a claim term and "remarks made to distinguish claims from the prior art are broader than necessary to distinguish the prior art, the full breadth of the remark is not 'a clear and unambiguous disavowal of claim scope as required to depart from the meaning of the term provided in the written description.'" 3M Innovative Props. Co. v. Avery Dennison Corp., 350 F.3d 1365, 1373 (Fed. Cir. 2003) (quoting Storage Tech. Corp. v. Cisco Sys., Inc., 329 F.3d 823, 833 (Fed. Cir. 2003)).

As a threshold matter, neither party disputes that the terms "portable computer" and "portable computer microprocessing system," as used in the preambles of the asserted claims, limit their scope. "In considering whether a preamble limits a claim, the preamble is analyzed to ascertain whether it states a necessary and defining aspect of the invention, or is simply an introduction to the general field of the claim." On Demand Mach. Corp. v. Ingram Indus., 442 F.3d 1331, 1343 (Fed. Cir. 2006). The terms at issue here clearly recite a necessary and defining aspect of the invention, specifically its portability. The written description and applicants' statements during prosecution emphasize this feature of the invention, yet this limitation does not appear in the body of the claims. As a result, this court finds that the terms "portable computer" and "portable computer microprocessing system" limit the scope of the asserted claims.

The district court construed the portable computer limitation to require "a computer without a built-in display or keyboard that is capable of being moved or carried

about." Claim Construction Order, 2006 U.S. Dist. LEXIS 58388, at *32-33. The parties do not dispute that the limitation requires a computer "that is capable of being moved or carried about." This court agrees that the plain meaning of "portable" and its use in the specification and prosecution history require the computer to be "capable of being moved about." This appeal focuses on the "a built-in display or keyboard" component of the district court's construction.

During prosecution, in a Response dated June 15, 1992, the applicants sought to distinguish their invention from Herron. The applicants' statements clearly and unambiguously disavowed computers with built-in displays and keyboards – that is, laptops. At the outset of those statements, the applicants distinguished their invention, a portable microprocessing system, from its peripheral devices:

> The Applicants' invention is a portable microprocessing system with a microcomputer contained within a housing. As is typical of such systems, the microprocessor interfaces with several peripheral devices including a keyboard, display, modem, serial and parallel port devices, a power source, etc. The Applicants' system provides all of the interfaces for these devices at a set of interface connectors on the rear bezel of the housing.

Amendment to U.S. application no. 07/711,816, dated June 15, 1992, at 13. The applicants expressly listed a keyboard and display as peripheral devices. They also explained that the interface connectors for the keyboard and display are located on the rear bezel of the housing. If the keyboard and display were built-in or attached to the housing like a laptop, these peripheral connections would not be necessary.

In the same Response, the applicants also contrasted the advantages of their invention with the limitations of the Herron laptop:

> The Applicants' system therefore provides an extremely powerful utility. A full-sized microprocessor with large memory capacity is made completely portable. The processing unit housing or "brick" can be easily removed from one system and transported in a briefcase to another system. Rather

> than requiring a portable display and keyboard, the present invention concentrates on portability of an exceptionally large memory capacity in hard disk drive. . . . For the same sized unit as a conventional lap-top computer, the invention does require that peripherals be made available at each location, a requirement that would lead one away from the present invention. However, even that requirement can be an advantage over laptop computers in that higher quality peripherals will more likely be used since they need not be transported. Thus, lap-top machines make concessions in memory, display and other areas in favor of portability. The Applicants' system, on the other hand, is a portable full service microprocessing system which concedes portability of peripherals.

Id. at 14-15. (emphases added). In this statement, the applicants clearly distinguished their invention from computers with a built-in display or keyboard. They told the examiner that the invention concedes portability of peripherals, which they previously defined to include displays and keyboards, in favor of processing power and memory. As a result, they stated that the invention does not require a built-in display and keyboard. In fact, the applicants explained that the invention requires these peripherals at each location of use. In contrast, the applicants emphasized that laptops sacrificed the power of the claimed full-service microprocessing system in favor of built-in peripherals. The applicants also stated that the built-in display and keyboard of a laptop would be inferior in quality to the peripherals stored permanently at each location and used with the claimed invention.

Moreover, the applicants further distinguished their system from the Herron "laptop computer with its own flat panel display and keyboard," arguing that laptops did not have the memory capacity, utilities and functionalities of their system:

> The Herron system does not allow a microprocessor having state-of-the-art memory capacity and other capabilities to interface to a full-service processing system as does the Applicants' system. The Herron system allows a lap-top computer with its own flat panel display and keyboard to interface to other peripheral devices. This lap-top computer does not possess utilities and functionalities comparable to those of the Applicants' system.

Id. at 17.

The applicants also distinguished their invention from laptops based on how the devices connect to the docking station. Because the keyboard and display are not built into the claimed microprocessing system, the applicants described the system as able to fit vertically in the docking station. Because of its built-in keyboard and display, a laptop could not fit vertically. Specifically, the applicants stated: "The Herron reference discloses a docking module which is latched to the rear of a lap-top computer. The computer and docking module rest on a desk top." Id. at 16. "[T]he computer in Herron is not oriented vertically as in the Applicants' system. It would make no sense to do so with the Herron lap-top with its attached keyboard and display. Therefore, Herron does not have the Applicants' reduced footprint size." Id. at 17.

This Response to the examiner also referred to laptops. In this statement, the applicants saw that laptops too might find a use for the claimed system:

> A single connector to implement all of the interfaces provides for easy connection and disconnection and may be used to advantage with lap-top computers as well. For example, the lap-top system of Herron, et al. docks to several connectors making it difficult to align the connectors before docking.

Id. at 15.

This statement, however, does not bring a laptop within the scope of the claims. Instead, the statement suggests that one component of the claimed invention, a single docking connector, could be used with laptops. The single docking connector is one of several limitations recited in the claims, recited separately from the portable computer limitation. Thus this reference to laptops, if anything, just represents another attempt to distinguish the invention from the laptops of Herron.

A careful reading of the prosecution history leaves little doubt that the distinctions between the invention and Herron are more extensive than only the single connector limitation. This court observes that the applicants distinguished their invention from the prior art in multiple ways. Nonetheless a disavowal, if clear and unambiguous, can lie in a single distinction among many. See Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1374 (Fed. Cir. 2007); Norian Corp. v. Stryker Corp., 432 F.3d 1356, 1362 (Fed. Cir. 2005) ("[W]e have not allowed [patentees] to assert that claims should be interpreted as if they had surrendered only what they had to."). Moreover, the examiner's citation of the single connection limitation in the reasons for allowability does not erase the applicants' clear disavowal of laptops. Cf. Laitram Corp. v. Morehouse Indus., Inc., 143 F.3d 1456, 1462 (Fed. Cir. 1998) (finding prosecution statements relevant to claim construction although the examiner did not rely on them). Of course, a multitude of distinctions may serve to make any single distinction in the group less clear and unmistakable as the point of distinction over prior art and as a critical defining point for the invention as a whole.

Moreover, the prosecution history must always receive consideration in context. For instance, in 3M Innovative Props., 350 F.3d at 1373, this court held that the patentee had "expressly defined a term in the specification," and that the definition would control over broad remarks during prosecution. In this case, however, the specification of the '645 patent does not provide an express definition of "portable computer" that would override or make the distinctions in the prosecution history ambiguous.

As noted, the specification in this case does not create any ambiguity. The Background section describes a hierarchy of computer systems based on "size and processing ability": mainframe systems, mini-computer systems, microcomputer systems or personal computers, and laptop computers. '645 patent col.1 ll.7-21. Thus, the specification contrasts the microcomputer system with a laptop computer. Furthermore, the specification repeatedly describes the invention as a microcomputer. See, e.g., id., Abstract ("A microcomputer system includes a microprocessor and a housing for holding the microprocessor."); col.3 ll.14-16 ("In accordance with the present invention a microcomputer works equally well for business applications as it does for personal applications."); col.3 ll.21-22 ("Fig. 1 depicts the main housing 10 of the microcomputer of the present invention.") In contrast, the specification never identifies the invention as a laptop.

CDSC argues that the specification discloses an embodiment with a built-in display and keyboard, specifically the embodiment illustrated in Figures 13-15. However, the text and the figures demonstrate that the keyboard and display are not actually built into the computer in this disclosed embodiment. Rather, the specification explains that a keyboard and visual display are "options available with the system." Id. col.2 ll.8-11. Figure 13 shows how a keyboard 60 and display 58 "may be coupled to the microcomputer system." Id. col.7 ll.23-24; see also id., col.2 ll.64-66 ("FIG. 13 shows a possible configuration of the microcomputer system that includes a keyboard, a visual display and a dc power source."). As discussed above, the Background of the Invention distinguishes microcomputers from laptop computers. And the keyboard shown in Figure 13 is physically separate from the main housing. The text confirms that

the keyboard is connected to the housing using connector 24b, shown on the left-hand side of the rear bezel in Figure 6. Id. col.5 ll.30-31. Thus, a cable connects the physically separate keyboard to the main housing. The keyboard is neither built-in nor attached. Figure 15 only illustrates that the keyboard may be folded with the display and microcomputer for economy of space. Id. col.3 ll.1-3; col.7 ll.43-44. Further, the display illustrated in Figure 14 is easily attachable and detachable, not built-in. The specification describes using connectors 70 and 72, a "mechanical mechanism," and thumb screws 65, which "simplif[y] the process of removing the mechanical connections." Id. col.7 ll.28-42.

The claims do not recite the term "microcomputer." This point, however, does not alone expand the claims beyond the microcomputer embodiment described in the specification. To the contrary, a person of ordinary skill is deemed to read the claim terms in the context of the entire patent, including the specification and prosecution history. Phillips, 415 F.3d at 1313. Thus, the specification does not suggest that the claimed invention encompasses laptops. Rather the written description emphasizes differences between the claimed invention and laptops. At a minimum, the specification does not cut against the applicants' clear disavowal of laptop computers in the June 15, 1992 Response.

As noted above, the "totality of the prosecution history" informs the disavowal inquiry. Rheox, Inc. v. Entact, Inc., 276 F.3d 1319, 1326 (Fed. Cir. 2002). Here the sum of the patentees' statements during prosecution would lead a competitor to believe that the patentee had disavowed coverage of laptops. Cf. Seachange Int'l, Inc. v. C-COR, Inc., 413 F.3d 1361, 1372 (Fed. Cir. 2005) (prosecution disclaimer protects the

right of competitors to rely on representations made by the patentee during prosecution to guide their conduct). CDSC cannot recapture claim scope disavowed during prosecution to prove infringement. See Chimie, 402 F.3d at 1384. The trial court correctly determined that the portable computer limitation requires "a computer without a built-in display or keyboard that is capable of being moved or carried about."

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). CDSC stipulated that if the claims are construed to require a computer without a built-in display and keyboard, Defendants' accused laptops and docking stations do not infringe. Thus, without a dispute of fact on a limitation required by every asserted claim, this court finds that Defendants are entitled to summary judgment of non-infringement. Because Defendants' laptops and docking stations do not infringe the portable computer limitation, this court does not reach the issues related to the all connections limitation, including the district court's denial of CDSC's Rule 56(f) motion.

III

A court may award reasonable attorney fees to prevailing parties under 35 U.S.C. § 285 if it finds, by clear and convincing evidence, that the case is "exceptional." Beckman Instruments, Inc. v. LKB Produkter AB, 892 F.2d 1547, 1551 (Fed. Cir. 1989). When the accused infringer prevails in the underlying action, factors relevant to the inquiry include the closeness of the question, pre-filing investigation and discussions with the defendant, and litigation behavior. See Serio-US Indus., Inc. v. Plastic Recovery Techs., Inc., 459 F.3d 1311, 1322 (Fed. Cir. 2006) (upholding trial court's finding that defendant was not entitled to award of attorney fees under § 285 when

plaintiff relied on opinion of patent counsel and made efforts to talk with defendant before bringing suit); Cambridge Prods., Ltd. v. Penn Nutrients, Inc., 962 F.2d 1048, 1050 (Fed. Cir. 1992) (concluding that reasonable pre-filing inquiry shown by plaintiff's testing of sample of allegedly infringing product, commissioning chemical analyses and acquiring documentary evidence that appeared to confirm that accused product fell within chemical specifications of patented method, even if plaintiff did not ask alleged infringer about the method it practiced).  If the patentee prolongs litigation in bad faith, an exceptional finding may be warranted.  See Rohm & Haas Co. v. Crystal Chem. Co., 736 F.2d 688, 691 (Fed. Cir. 1984).

This court detects no clear error in the district court's finding that this case is not exceptional.  With respect to CDSC's decision to file suit, the district court found that the applicants' disavowal of laptops "did not seem self-evident at the beginning of the claim construction analysis."  Fees Order, 2007 U.S. Dist. LEXIS 24045, at *12.  The district court also found that CDSC "engaged in a serious effort to evaluate the likelihood of success on its patent claims."  Id. at *13.  The record supports this finding.  CDSC submitted affidavits from its employees and its in-house and outside counsel, who attested to CDSC's pre-filing investigation of the patent, prosecution history, and the accused devices.  Before filing suit, one of CDSC's engineers dismantled and performed various electrical tests on one of the Defendants' accused products, CDSC engaged in licensing discussions or attempted to do so with each Defendant, and CDSC sent infringement charts to each Defendant.  Id. at *12.  Although this court agrees with the district court that the applicants clearly disavowed laptops in the prosecution history, based on the evidence of pre-filing activities in the record, the

district court's finding that the action was not objectively baseless was not clearly erroneous. See Serio, 459 F.3d at 1322; see also Kao Corp. v. Unilever U.S., Inc., 441 F.3d 963, 974 (Fed. Cir. 2006) (affirming denial of attorney fees despite the patentee's knowledge that the claims did not cover salt forms of copolymer and that the accused infringer's products used a salt form of polymer).

The district court also found that CDSC's decision to continue the litigation after the district court's claim construction did not make this an exceptional case. Fees Order, 2007 U.S. Dist. LEXIS 24045, at *14-17. CDSC attempted to obtain a final judgment of non-infringement to expedite appeal of the district court's claim constructions. The parties could not agree on the form of judgment with respect to the all connections limitation. As a result, the district court denied the motion and later granted Defendants' motion for summary judgment on both limitations. On appeal, the parties devote substantial portions of their briefs to addressing the construction of the all connections limitation and whether there are disputed issues of material fact with respect to whether at least some of the accused products infringe it. If this court had reversed the district court's construction of the portable computer limitation, CDSC might have been able to prevail on the all connections limitation. Thus, the district court did not clearly err in refusing to find the case exceptional based on CDSC's decision to continue the litigation.

This court affirms the district court's grant of summary judgment of non-infringement of the portable computer limitation, and its denial of attorney fees and costs under 35 U.S.C. § 285.

AFFIRMED

## COSTS

Each party shall bear its own costs.