892 F.2d 1547
 13 U.S.P.Q.2d 1301
 BECKMAN INSTRUMENTS, INC., Plaintiff/Cross-Appellant,
v.
LKB PRODUKTER AB, Wallac Oy, Pharmacia LKB Nuclear
Microtomy, Inc. and Pharmacia LKB Biotechnology,
Inc., Defendants-Appellants.
 Nos. 88-1582, 88-1583.
 United States Court of Appeals,
Federal Circuit.
 Dec. 13, 1989.
 
 Donald R. Dunner, of Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., argued for plaintiff/cross-appellant. With him on the brief were Roger D. Taylor and Darrel C. Karl, of Finnegan, Henderson, Farabow, Garrett & Dunner.
 Robert H. Stier, Jr., of Bernstein, Shur, Sawyer & Nelson, Portland, Me., argued for defendants-appellants. Of counsel were Philip L. Cohan, of Piper & Marbury, Washington, D.C., and Charles L. Gholz, of Oblon, Fisher, Spivak, McClelland & Maier, Arlington, Va.
 Before RICH, Circuit Judge, MILLER, Senior Circuit Judge, and ARCHER, Circuit Judge.
 RICH, Circuit Judge.
 
 
 1
 Defendants LKB Produkter AB, Wallac Oy, Pharmacia LKB Nuclear Microtomy, Inc., and Pharmacia LKB Biotechnology, Inc. (collectively LKB) appeal from the judgment of the United States District Court for the District of Maryland entered upon a jury verdict that LKB infringed claims 2 and 4 of U.S. Patent No. 4,029,401 ('401). LKB also appeals from the district court's decision, reported in Beckman Instruments, Inc. v. LKB Produkter AB, 703 F.Supp. 408, 8 USPQ2d 1605 (D.Md.1988), to deny LKB's motion for a new trial and to impose plaintiff's attorney fees and expenses on LKB under 35 U.S.C. § 285. Plaintiff Beckman Instruments, Inc. (Beckman) cross-appeals based upon the district court's decision not to include Beckman's fees and expenses for expert witnesses and consultants in its calculation of attorney fees. We affirm-in-part, vacate-in-part, and remand.BACKGROUND
 
 
 2
 Patent '401 to Nather is for methods and apparatus for improving the accuracy of counting techniques in liquid scintillation counters (LSC's). LSC's are used in biological and pharmacological research to measure the amount of a radioactive tracer isotope present in a liquid biological sample. They detect light flashes or scintillations caused by radioactive emissions within the sample and convert those light flashes into electronic pulses. The electronic pulses are then sorted according to their amplitude and frequency, and displayed in a characteristic distribution curve or spectrum for the isotope being measured. The amount of the isotope present can then be calculated.
 
 
 3
 Researchers have long known that LSC's suffer from a phenomenon known as "quench". Quench is an interference with an LSC's ability to detect the full number and intensity of the scintillations in a given sample due to the sample's chemical or color content. In the mid-1960's, several groups of researchers filed patent applications on methods and apparatus which would compensate for the effect of quench. One of these applications belonged to Nather, which, after an extended prosecution including an interference proceeding, issued as the '401 patent on June 14, 1977.
 
 
 4
 LKB is in the business of making LSC's, which it sells in the United States and elsewhere. One such LSC manufactured by LKB includes an "auto window" chip within its computer hardware. This auto window chip performs the function of automatically compensating for quench in the sample.
 
 
 5
 Beckman filed its complaint on July 23, 1985, alleging that the LKB models which contain the auto window feature infringe claims 3-7 of the '401 patent. Several defenses were raised, including invalidity of the patent, inequitable conduct, and lack of personal jurisdiction over co-defendant LKB Produkter. In addition, LKB filed an antitrust counterclaim. The personal jurisdiction defense and the antitrust counterclaim were eventually dropped by LKB. The inequitable conduct defense was severed for a separate bench trial following a jury trial of the validity and infringement issues.
 
 
 6
 The jury found the three apparatus claims in issue (3, 5 and 6) invalid and not infringed and found the two method claims (4 and 7) "valid" [sic, not proved invalid] and infringed. The jury also found that the infringement was not willful and awarded damages of $1,028,000. Upon hearing further testimony concerning the inequitable conduct issue, the court found no basis for a holding of inequitable conduct, and so entered judgment for Beckman on the jury's verdict. Beckman Instruments, Inc. v. LKB Produkter AB, 5 USPQ2d 1462 (D.Md.1987).
 
 
 7
 The judge also entered a permanent injunction prohibiting LKB from future infringement of the '401 patent. The exact wording of a portion of the injunction is as follows:
 
 
 8
 Defendants are further ordered, within 30 days of the effective date of this order, to deliver to counsel for plaintiffs for destruction all [auto window chips] ... which are in the defendants' possession, custody, or control within the United States....
 
 
 9
 Counsel for LKB apparently concluded that the above language gave LKB the option to ship the auto window chips out of the United States within the 30-day period instead of surrendering them for destruction. Therefore, a great many of the auto window chips in the U.S. at the date of the injunctive order were shipped to LKB's business in Finland. Ten demonstrator LSC's which included the auto window feature were allowed to remain in the United States. The district court found these activities to be a deliberate and repeated violation of the injunction. Beckman, 703 F.Supp. at 410, 8 USPQ2d at 1608.
 
 
 10
 Finally, the district court found the case to be "exceptional", and so awarded attorney fees and litigation expenses to Beckman under 35 U.S.C. § 285. In holding the case exceptional, the court relied on both the alleged violations of the injunction and LKB's vexatious litigation strategy. 703 F.Supp. at 410, 8 USPQ2d at 1607. The district court awarded all of Beckman's attorney fees and expenses (totalling $1,969,664.44) except for those relating to the fees and expenses of expert witnesses and consultants (totalling $409,406.10), which the court was not certain were awardable under 35 U.S.C. § 285.
 
 OPINION
 I. The Jury Verdict
 
 11
 LKB maintains that the jury verdict should be vacated because apparatus claims 3, 5 and 6, which were found both invalid and non-infringed, are so similar to method claims 4 and 7, which were found both valid and infringed, that the jury's verdict is inherently inconsistent. As we stated in Allen Organ Co. v. Kimball International Inc., 839 F.2d 1556, 1563, 5 USPQ2d 1769, 1774 (Fed.Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 132, 102 L.Ed.2d 104 (1988), the issue of inconsistent jury findings is a procedural matter not unique to patent law, and as such, we apply the discernable law of the forum.
 
 
 12
 Under the law of the Fourth Circuit, when the jury's findings apparently conflict, "the court has a duty to harmonize the answers, if it is possible to do so under a fair reading of them." Ladnier v. Murray, 769 F.2d 195, 198 (4th Cir.1985) (citations omitted). On LKB's motion for a new trial, the district court found no conflict in the jury's findings and held that: (1) LKB had waived any objection concerning the findings on validity by failing to object to the jury instruction that "each claim of a patent ... is presumed valid independently of the validity of any other claims of the patent"; and (2) since the analysis for determining infringement is different for method claims than for apparatus claims, the jury's verdict is not so inconsistent as to be irrational. Beckman, 703 F.Supp. at 412-13, 8 USPQ2d at 1606. Upon review of the record before us, we are not convinced that the district court made an error of law in reconciling the jury's findings, and so affirm the denial of a new trial.
 
 II. The Allegedly Erroneous Jury Instruction
 
 13
 LKB also appeals the denial of a new trial based on an allegedly erroneous jury instruction concerning the availability of non-enabling references as prior art. The particular language which LKB considers erroneous is as follows:
 
 
 14
 For the Jordan patent to anticipate claims 5 and 7 of the '401 patent, it must expressly or inherently teach the entire claim.
 
 
 15
 A prior art reference must be enabling before it can invalidate the '401 patent. That is, it must provide a description sufficient to teach a person of ordinary skill in the art how to make and use the apparatus or process. However, it is not necessary that the prior art have been actually made in order to satisfy the enablement requirement.
 
 
 16
 ....
 
 
 17
 References relied upon to support a rejection for obviousness must provide an enabling disclosure. That is to say, they must place the claimed invention in the possession of the public.
 
 
 18
 LKB's objection lies not so much with the instructions itself, but with the combination of the instruction and certain expert testimony by Beckman's expert witness. Specifically, one of the issues argued at trial was whether or not the device disclosed in the Jordan patent was operable to achieve its stated goal. After presenting expert testimony that it was not, Beckman's patent expert testified as follows:
 
 
 19
 Q. Now, assuming that their testimony on whether or not Jordan worked is credible, what impact does that have on whether Jordan can be relied on to invalidate the Nather patent?
 
 
 20
 A. Well, a piece of prior art that doesn't work is not prior art.
 
 
 21
 Q. What does that mean in terms of whether it can be relied on to invalidate the patent?
 
 
 22
 A. It means it can't be relied on.
 
 
 23
 Q. Why is that the basic rule or principle--
 
 
 24
 A. It doesn't teach anything useful or helpful, the technology is useless. It doesn't operate and therefore doesn't contribute anything and therefore can't be prior art to somebody else.
 
 
 25
 LKB contends that the combination of the jury instruction and the above testimony would improperly lead the jury to believe that if the Jordan device was not operable, it could be disregarded as prior art.
 
 
 26
 First, the above testimony of Beckman's expert witness was clearly a misstatement of the law. Even if a reference discloses an inoperative device, it is prior art for all that it teaches. 2 D. Chisum, Patents § 5.03 (1989); Minnesota Min. & Mfg. Co. v. Blume, 684 F.2d 1166, 1172, 215 USPQ 585, 590 (6th Cir.1982) (dictum), cert. denied, 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983).
 
 
 27
 Second, the jury instruction complained of is a correct statement of the law. In order to render a claimed apparatus or method obvious, the prior art must enable one skilled in the art to make and use the apparatus or method. In re Payne, 606 F.2d 303, 314, 203 USPQ 245, 255 (CCPA 1979). Therefore, LKB has no grounds for complaining that the jury instruction was wrong. If in fact the jury was confused by the combination of the jury instruction and the expert testimony, the fault is with the expert testimony, not the jury instruction. In such a case, LKB should not try to correct the error by objecting to the jury instruction, but by discrediting the erroneous expert testimony either through cross-examination or through its own expert testimony.
 
 
 28
 Therefore, the district court correctly denied LKB's motion for a new trial based on the allegedly erroneous jury instruction.
 
 III. The Award of Attorney Fees
 
 29
 (a) Exceptional case
 
 
 30
 35 U.S.C. § 285 provides that the court in "exceptional cases may award reasonable attorney fees to the prevailing party." While the decision to award attorney fees is discretionary with the trial judge, the finding that a case is "exceptional" is a finding of fact reviewable under the "clearly erroneous" standard. Reactive Metals and Alloys Corp. v. ESM, Inc., 769 F.2d 1578, 1582-83, 226 USPQ 821, 824 (Fed.Cir.1985). Among the types of conduct which can form a basis for finding a case exceptional are willful infringement, inequitable conduct before the P.T.O., misconduct during litigation, vexatious or unjustified litigation, and frivolous suit. Standard Oil Co. v. American Cyanamid Co., 774 F.2d 448, 455, 227 USPQ 293, 298 (Fed.Cir.1985). Such conduct must be supported by clear and convincing evidence. Reactive Metals, 769 F.2d at 1582, 226 USPQ at 824.
 
 
 31
 The district court found the case exceptional because LKB's litigation strategy was vexatious and because LKB had deliberately and repeatedly violated the permanent injunction. The court gives three examples of LKB's vexatious conduct: the jurisdiction defense which was dropped, the antitrust counterclaim which was dropped, and the inequitable conduct defense which was found to be baseless. In arguing that the court erred in finding the case exceptional, LKB maintains that we should review only the three particular examples cited by the district court. We disagree. While it is necessary for the district court to articulate the particular factual findings on which the ultimate finding of "exceptional circumstances" is based, Id., when the court's finding of vexatious litigation is based on a "strategy", we do not feel that it is necessary for the district court to set forth every underlying fact which contributed to its conclusion.
 
 
 32
 Viewed individually, the specific examples of vexatious conduct recited by the district court are somewhat tenuous. In particular, we find it difficult to agree that the inequitable conduct defense was "baseless" when it survived a motion for summary judgment and was rejected only after findings were made on disputed facts (see Beckman Instruments, 5 USPQ2d at 1463). With respect to the other defense and counterclaim which were dropped, the mere fact that an issue was pleaded and then dropped prior to trial does not in itself establish vexatious litigation. See Stickle v. Heublein, Inc., 716 F.2d 1550, 219 USPQ 377 (Fed.Cir.1983).
 
 
 33
 However, the district court's finding of exceptional circumstances is based on a strategy of vexatious activity. The three specific examples discussed above are clearly indicated to be merely that--examples. There is certainly sufficient evidence in the record to support a finding that there was additional vexatious conduct on the part of LKB.[1] While it is difficult to infer bad faith on the part of LKB when each action is viewed individually, when viewed together, we cannot say that the district court's finding of vexatious litigation was clearly erroneous. This is especially true considering that the district judge was in much the best position to monitor LKB's litigation "strategy."[2]
 
 
 34
 LKB has characterized the district court's findings concerning violation of the injunction as further examples of their alleged "vexatious conduct." However, we are satisfied that a fair reading of the district court's opinion indicates that the violations of the injunction constituted an additional basis for finding exceptional circumstances. Such activity could certainly be said to fall under the category of "litigation misconduct." And while LKB contends that the violations of the injunction occurred through honest mistake and oversight, we agree with the district court that the injunction is clear on its face. We conclude that the district court's findings concerning the violations of the injunction are not clearly erroneous.
 
 
 35
 In view of the foregoing, we affirm the district court's finding that the case is "exceptional."
 
 
 36
 (b) Amounts
 
 
 37
 The next step is to determine whether the district court abused its discretion in awarding fees and in setting the amount of the fees. The district court's decision will be upheld unless it is based on an error of law or clearly erroneous fact findings, or unless the district court committed a clear error of judgment. J.P. Stevens Co. v. Lex Tex Ltd., 822 F.2d 1047, 1050, 3 USPQ2d 1235, 1237 (Fed.Cir.1987); PPG Industries Inc. v. Celanese Polymer Specialties Co., 840 F.2d 1565, 1567, 6 USPQ2d 1010, 1013 (Fed.Cir.1988). While we find no abuse of discretion in the district court's decision to award fees, we find that the amount of the fees awarded is unreasonable, and to that extent an abuse of discretion.
 
 
 38
 The purpose of § 285 when applied to accused infringers is generally said to be two-fold: one, it discourages infringement by penalizing the infringer; and two, it prevents "gross injustice" when the accused infringer has litigated in bad faith. See Machinery Corp. of America v. Gullfiber AB, 774 F.2d 467, 227 USPQ 368 (Fed.Cir.1985); Rohm & Haas Co. v. Crystal Chemical Co., 736 F.2d 688, 222 USPQ 97 (Fed.Cir.1984). However, we are aware of few cases in which a patent owner has been granted attorney fees solely on the basis of litigation misconduct, without a concurrent finding of willful infringement.[3] ] In the present case, the jury explicitly found the infringement to be not willful, a finding which the trial judge did not disturb.
 
 
 39
 There being no willful infringement in this case, the purpose of discouraging infringement is not relevant. Thus, the fee award can be justified solely by the need to prevent gross injustice. Since any injustice present in this case is based upon LKB's bad faith and misconduct during litigation, the penalty imposed must in some way be related to bad faith and misconduct. While we can certainly imagine a case in which litigation misconduct would justify an award of attorney fees for the entire litigation (see Livesay Window Co., supra, note 3), we are not persuaded that this is the case here.
 
 
 40
 The district court found that LKB was guilty of engaging in a vexatious litigation strategy and of deliberately violating the injunctive order. While, as related above, we do not consider this finding to be clearly erroneous, we are not satisfied that such conduct justifies imposing all of Beckman's attorney fees, totalling almost $2,000,000, on LKB. The present lawsuit was instigated by Beckman prior to any misconduct by LKB, and Beckman would have incurred substantial legal expenses regardless of LKB's misconduct. In this respect, the case differs from cases in which willful infringement on the part of an infringer or inequitable conduct on the part of a patentee led to the bringing of the lawsuit. It was only after the lawsuit was begun that LKB engaged in misconduct, requiring Beckman to expend extra legal effort to counteract their misconduct.
 
 
 41
 To require Beckman to pay its attorneys to defend against LKB's vexatious litigation strategy and misconduct would be a gross injustice. However, that can be avoided by awarding Beckman the portion of its attorney fees which related to the vexatious litigation strategy and other misconduct. The determination of the amount of the award remains within the discretion of the trial court, since it is the trial judge who is in the best position to know how severely LKB's misconduct has affected the litigation. However, the trial judge here did not in any way consider the extent of LKB's misconduct in determining the amount of damages; once the trial judge determined that the case was "exceptional," he awarded all of Beckman's attorney fees, checking only to make sure that the sum was reasonable in relation to the entire lawsuit. Accordingly, we hold that the trial judge's failure to take into account the particular misconduct involved in determining the amount of fees was an abuse of discretion.
 
 
 42
 Furthermore, while the parties did not discuss the issue on appeal, § 285 provides only for attorney fees being paid to the prevailing party. In the present case, Beckman accused LKB of infringing five claims of the '401 patent; of these claims, only two were found not to be invalid and to be infringed. The other three claims were found invalid and not infringed. Therefore, there is some question whether Beckman can be considered altogether a "prevailing party" for the purpose of § 285. Once again, we are given very little assistance by the case law, since very few cases have involved an award of attorney fees after a "split" jury verdict. The commentators seem to suggest, however, that the correct approach is either to deny fees entirely, or to grant fees only to the extent that a party "prevailed." See 5 D. Chisum, Patents § 20.03 (1989); A. Ahart, Attorneys' Fees: The Patent Experience, 57 J. Pat. Off. Soc'y 608 (1975). See also Dixie Cup v. Paper Container Mfg. Co., 169 F.2d 645, 78 USPQ 222 (7th Cir.1948); Cf. Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (when awarding fees under 42 USC 1988, the extent to which the plaintiff succeeded must be taken into account in determining reasonable fees).
 
 
 43
 When infringement is found to be willful, the policy behind § 285 of discouraging infringement might justify imposing all of the patent owner's attorney fees on the infringer, even if the infringer prevailed as to some of the claims in suit. However, we are of the opinion that when the sole basis for imposing attorney fees is "gross injustice," and one party prevails on some claims in issue while the other party prevails on other claims, this fact should be taken into account when determining the amount of fees under § 285. In other words, the amount of fees awarded to the "prevailing party" should bear some relation to the extent to which that party actually prevailed. We hold the failure of the district court to take into account this factor in assessing fees in the present case constituted an abuse of discretion.
 
 
 44
 Since the district court abused its discretion in determining the amount of fees to be awarded, we vacate the award of attorney fees, and remand for a new determination of reasonable fees upon consideration of the factors discussed above.
 
 
 45
 (c) Fees of Experts and Consultants
 
 
 46
 Finally, with respect to Beckman's cross-appeal, the district court refused to award Beckman's fees and expenses for experts and consultants, indicating that it was not clear to the court that such fees and expenses were awardable under § 285. In view of our decision in Mathis v. Spears, 857 F.2d 749, 758-59, 8 USPQ2d 1551, 1558-59 (Fed.Cir.1988), it is now clear that such fees are awardable. Therefore, on remand, the district court should take these fees and expenses into account in determining reasonable fees under § 285, subject, of course, to consideration of the other factors set forth in section III of this opinion.
 
 CONCLUSION
 
 47
 The decision of the district court is affirmed-in part, vacated-in part, and remanded.
 
 COSTS
 
 48
 Each party to bear its own costs.
 
 
 49
 AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED
 
 
 
 [1]
 For example, there is evidence in the record that LKB pleaded further defenses which were of only marginal relevance to the case, and engaged in various discovery and trial abuses. It is difficult from the "cold record" before us to get a sense of the extent of the abuses or of the good or bad faith involved. Therefore, we defer to the opinion of the trial judge who was actively involved in the proceedings
 
 
 [2]
 LKB also contends that it was improper for the district court to consider a non-patent claim, namely the antitrust counterclaim, in a recovery under 35 U.S.C. § 285. However, in an action having both patent and non-patent claims, recovery may be had under § 285 for the non-patent claims if the issues involved therewith are intertwined with the patent issues. See Stickle v. Heublein, 716 F.2d at 1564, 219 USPQ at 387. Since LKB's antitrust claim was based on alleged inequitable conduct in the PTO, this is certainly the case in the present litigation
 
 
 [3]
 In Livesay Window Co. v. Livesay Industries, Inc., 251 F.2d 469, 116 USPQ 167 (5th Cir.1958), the court upheld an award of attorney fees against an infringer without a finding of willful infringement. However, in that case there was extensive evidence of litigation misconduct extending from the beginning of the lawsuit through 19 years of litigation. In Philip v. Mayer, Rothkopf Industries, Inc., 204 USPQ 753 (E.D.N.Y.1979), aff'd, 635 F.2d 1056, 208 USPQ 625 (2nd Cir.1980), the district court awarded partial attorney fees for litigation misconduct despite a finding that the infringement was not willful. However, the court limited recovery to the fees expended in responding to the infringer's misconduct